NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

```
                                    :
ABDUS SAMAD HAMILTON,               :
                                    :      Civil Action No. 14-1581(RMB)
              Petitioner,           :
                                    :
         v.                         :              OPINION
                                    :
PATRICK NOGAN, et al.,              :
                                    :
              Respondents.          :
                                    :
```

**BUMB**, District Judge

This matter comes before the Court upon the Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (Am. Pet., ECF No. 3) filed by Abdus Samad Hamilton ("Petitioner"), an inmate confined in New Jersey State Prison in Trenton, New Jersey. Respondent filed an Answer opposing habeas relief. (Answer, ECF No. 10.)

I.   PROCEDURAL HISTORY

On August 14, 2000, Lewis Palmer, Andrew Dennis and Petitioner were charged in Superior Court in Atlantic County, New Jersey, with first-degree armed robbery, assault, burglary, criminal restraint, possession of a weapon for an unlawful purpose, unlawful possession of a weapon, and conspiracy.

1

Petitioner was convicted on May 31, 2001. The trial judge denied Petitioner's motion for a new trial. He was sentenced to an aggregate term of imprisonment of thirty-years with a 25 ½ year period of parole ineligibility, and five-year period of supervised release.

Petitioner appealed. On June 29, 2004, the Appellate Division denied Petitioner's appeal, and the New Jersey Supreme Court denied certification on January 13, 2005. State v. Hamilton, Doc. No. A-422-01T4 (N.J. Super. Ct. App. Div. June 29, 2004) certif. denied 182 N.J. 428 (2005) ("Hamilton I") (ECF No. 10-14; 10-15.) Petitioner filed a pro se petition for post-conviction relief, and the PCR Court held a hearing on March 4, 2010, and denied relief ("Hamilton II"), (ECF No. 10-11.) The Appellate Division affirmed the PCR Court on June 4, 2012 ("Hamilton III"), (ECF No. 10-23), and the New Jersey Supreme Court denied certification on March 12, 2013 (ECF No. 10-25.) Before this Court is Petitioner's Amended Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a person in State Custody, raising eleven grounds for relief, and Respondent's Answer.

## II.  BACKGROUND

The factual background in this matter was summarized by the New Jersey Superior Court, Appellate Division upon Petitioner's direct appeal. Petitioner's appeal was consolidated with that of

2

his two co-defendants, Lewis Palmer and Andrew Dennis. <u>Hamilton</u> <u>I</u>, (ECF No. 10-14.) On August 14, 2000, Christopher Tuten, Lonell Blagrove, and Levine Dickerson were living in an apartment in Atlantic City, New Jersey. Blagrove and Dickerson were brothers. Tuten was a reputed drug dealer, and Dickerson occasionally worked for him, but Blagrove did not.

In August 2000, Blagrove had back surgery. When he returned home, he was wearing a back brace and taking pain medication. Around 8:30 a.m. on August 14, 2000, Tuten left the apartment to run errands. Dickerson and Blagrove remained. While waiting for a cab, Tuten met Defendant Dennis, whom he knew as a drug customer by the street name of Chauncy Fitzgerald or Fat Boy. Dennis inquired when Tuten would return so they could discuss business. Tuten told him 45 minutes. Dickerson observed this encounter from the window of the apartment, but he could not hear the conversation.

One hour later, Dennis appeared at the door of the apartment and asked Dickerson to let him in to wait for Tuten to return. Dickerson told Dennis that Tuten was not selling drugs from the apartment. Defendant Palmer, who had been standing behind the door, stepped forward and told Dickerson to back up. Dennis, Palmer and Petitioner stepped into the apartment. Blagrove walked in the room and recognized Dennis as a repeat

3

customer of Tuten. Blagrove and Dickerson recognized Palmer as their cousin. They did not know Petitioner.

Palmer and Dennis had heard that Tuten had $40,000 to $50,000 stashed in the apartment and demanded to know where it was. Blagrove and Dickerson denied there was any money. Palmer apologized because he had not known that Tuten lived with his cousins.

Palmer and Petitioner each removed an automatic handgun from under their shirts. Palmer showed Blagrove and Dickerson that his gun was not loaded. Dennis appeared to be unarmed, and he asked for Tuten's weapon. Palmer told Dennis and Petitioner that Tuten was fair game, but Dickerson and Blagrove were not. Dickerson and Blagrove were put in the back bedroom, but they could hear what was happening in the living room.

When Tuten knocked on the door, Palmer put a gas mask over his face. Petitioner pulled a dark bandana over his face. Dennis, unmasked, opened the door. The three defendants grabbed Tuten and pistol-whipped him. They searched Tuten but he had only a few hundred dollars. Dennis demanded more because he had heard Tuten was "pushing weight like 24 hours a day."

Tuten was told to strip to his underwear and sit on the loveseat. Petitioner threatened that if Tuten did not stop talking, he would "pop" him. Tuten challenged him, so Petitioner placed a cushion over his gun and shot Tuten in the right knee.

4

Dennis turned up the stereo to muffle the noise. Petitioner continued questioning Tuten while Dennis duct-taped him. Palmer left his post with Dickerson and Blagrove to inspect Tuten's wound, and reported that it was only "a little gunshot wound."

Petitioner threatened to shoot Tuten again, and Tuten challenged him, so Petitioner shot him in the left knee. After their search for money was unsuccessful, Palmer, Dennis and Petitioner escorted Blagrove and Dickerson to the bathroom and told them to wait ten minutes before calling an ambulance. Defendants disconnected the telephone lines and left the apartment.

Tuten began calling for help. Dickerson came out of the bathroom, reconnected the phones, and called an ambulance. Dickerson helped Tuten into the hallway.  Then Dickerson began to dispose of drugs from the apartment, placing some bags of marijuana in Blagrove's body brace. When the bags of cocaine would not flush down the toilet, Dickerson put them in his pockets and began mopping the blood off the floor.

The first officers to respond found Tuten in the doorway of the apartment. Tuten said he was shot while in the hallway. Officers went in the apartment and found drugs on Blagrove. Police removed Blagrove and Dickerson from the apartment. Tuten described his assailants as three black males, one wearing a yellow fleece jacket. A suspect wearing a yellow fleece jacket

5

was brought to the apartment, but Tuten said it was not the assailant.

Detective Riegal arrived on the scene, and Dickerson told him three men had shot Tuten. Blagrove and Dickerson were transported separately to the police station for further questioning. While on the way to the hospital, an officer questioned Tuten. Tuten identified himself as Chauncy Fitzgerald. Forensic officers searched the apartment and found duct tape, a pillow with two holes, a .40 caliber weapon, and drugs and drug paraphenelia.

At the police station, Blagrove and Dickerson gave similar statements describing the robbery. On August 16, 2000, Tuten told Detective Riegel his true identity. He said he knew one of his assailants. A few weeks later, he told the police the assailant's street name was Omar Sadiq, whom he knew by sight.

On August 31, 2000, Blagrove was shown a photo array, and he identified Petitioner. Dickerson was interviewed on September 3, 2000. Dickerson was told Dennis was in custody, and he was led to believe Dennis was cooperating. Dickerson then identified Palmer and Petitioner from photo arrays, but he refused to sign the identification form. After the defendants were indicted on October 10, 2000, Blagrove and Dickerson sought to recant their identifications. Blagrove and Dickerson were "reluctant" and "hostile" witnesses for the State. Despite their claimed memory

6

loss, the trial judge admitted the prior inconsistent statements of the witnesses.

## III. DISCUSSION

### A.   <u>Standard of Review</u>

28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"Contrary to clearly established Federal law" means the state court applied a rule that contradicted the governing law set forth in U.S. Supreme Court precedent or that the state court confronted a set of facts that were materially indistinguishable from U.S. Supreme Court precedent and arrived at a different result than the Supreme Court. <u>Eley v. Erickson</u>, 712 F.3d 837, 846 (3d Cir. 2013) (citing <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000)). The phrase "clearly established

Federal law" "refers to the holdings, as opposed to the dicta" of the U.S. Supreme Court's decisions. <u>Williams</u>, 529 U.S. at 412. An "unreasonable application" of clearly established federal law is an "objectively unreasonable" application of law, not merely an erroneous application. <u>Eley</u>, 712 F.3d at 846 (quoting <u>Renico v. Lett</u>, 130 S.Ct. 1855, 1862 (2010)).

    B.   <u>Analysis</u>

       1.   <u>Ground One</u>

Petitioner's first ground for relief is that the prosecutor, on the day before trial, had shown Charles Tuten a photo array containing Petitioner's photo, but Tuten could not identify him as the intruder who was wearing a bandana. (Am. Pet., ECF No. 3 at 29.) Although Tuten was able to identify Petition in court, he testified that no one had shown him a photo-lineup containing Petitioner's photo. (<u>Id.</u>) Petitioner contends he was denied the right to due process and a fair trial because the prosecutor did not "correct" Tuten's testimony. (<u>Id.</u>)

Respondent objects to this claim on procedural and substantive grounds. (Answer, ECF No. 10 at 25-29.) Respondent contends that Petitioner first raised this claim on appeal of the PCR Court's decision; therefore, it was never properly exhausted. (<u>Id.</u> at 27.) Courts, however, may deny an application for a writ of habeas corpus on the merits,

"notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

On the merits of the claim, Respondent points to testimony showing that the prosecutor indeed alerted the jury to the error in Tuten's testimony. (Id. at 27-28.) Investigator Keith Carmack testified:

> [PROSECUTOR]: Investigator Carmack, you've been working with me on this case, correct?
>
> [INV. CARMACK]: Yes, sir.
>
> [PROSECUTOR]: And on Tuesday last week you went to the Philadelphia airport to pick up Christopher Tuten, correct?
>
> [INV. CARMACK]: Yes, sir.
>
> [PROSECUTOR]: And I believe he testified on Wednesday, correct?
>
> [INV. CARMACK]: Yes, sir.
>
> [PROSECUTOR]: Prior to his coming up here did you and I sit with him for a few minutes?
>
> [INV. CARMACK]: On Tuesday afternoon.
>
> [PROSECUTOR]: Okay. Do you recall, I want to show you S-68, -70, -69 and -71. Do you recall me placing these exhibits in front of Christopher Tuten and then taking these cover sheets off and asking him if he recognized any of the pictures in these photographic line ups?
>
> [INV. CARMACK]: Yes, sir.

> [PROSECUTOR]: And was he unable to make photographic identification?
>
> [INV. CARMACK]: That is correct.
>
> [PROSECUTOR]: Did he actually look at S-69, which contains a photograph of Abdus Samad Hamilton?
>
> [INV. CARMACK]: Yes, he looked . . .

(Trial Transcript, ECF No. 10-7 at 205-206.)

The Appellate Division found "the transcript clearly reflects that Tuten equivocated in his in-court identification of defendant and the jury was apprised by Inv. Cormack of his presentation of the photographic array to Tuten the day before trial." Hamilton III, (ECF No. 10-23 at 10-11.) Furthermore, Petitioner's trial counsel argued in summation:

> The last line of testimony that came out of this chair was from the investigator sitting over there [Carmack] . . . And he said he proffered some pictures to Mr. Tuten, one of the people in this case . . . And he couldn't identify anybody. That was the last testimony I heard.

(Trial Transcript, ECF No. 10-8 at 189.)

Prosecutorial misconduct violates a defendant's right to due process when the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). A court must examine the prosecutor's actions in the context of the entire trial "assessing the severity of

10

the conduct, the effect of the curative instructions, the quantum of the evidence against the defendant, and the effect of curative instructions." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

Petitioner's contention that he was denied due process and a fair trial because the prosecutor failed to inform the jury of Tuten's failure to identify Petitioner from a photo array is contrary to the state court record. Not only did the prosecutor inform the jury of the out-of-court photo array, in summation, defense counsel reminded the jury of the investigator's testimony. There was no prosecutorial misconduct. Therefore, the Appellate Division's denial of this claim was not contrary to or based on an unreasonable application of clearly established federal law. This Court will deny Ground One of the Amended Petition.

2.   Ground Two

In Ground Two of the Amended Petition, Petitioner claims he was deprived of his Sixth Amendment right to counsel by his counsel's failure to move for a Wade Hearing or to strike Blagrove's and Dickerson's in-court identifications of him. (Am Pet., ECF No. 3 at 30-34.) Respondent asserts the State PCR court, affirmed by the Appellate Division, painstakingly detailed why he would not have granted a Wade hearing if defense

11

counsel had requested it during trial. (Answer, ECF No. 10 at 31.)

The PCR Judge found:

> As to the Wade issue, I really don't understand a great deal of the defense perception of entitlement to a Wade hearing. First of all, the Prosecutor's correct that not everybody [is] entitled to a Wade Hearing unless there is a prima facie argument made and established that there was undue suggestiveness.
>
> Now, there was nothing ever presented with regard to that. To the contrary. Even at trial there was no evidence . . . that there was any undue suggestiveness by police or by anyone working for the police.
>
> [The] . . . out-of-court identifications . . . were criticized . . . by the witness[es] themselves in their rather putrid and pathetic recantations so that they lent even more credence to . . . the prior procedures because it was obvious that they didn't want to cooperate, they didn't want to be involved in this, they didn't want to be snitches on the streets w[h]ere somebody could take out vengeance . . .
>
> So to suggest that a Wade hearing should have been demanded, - I don't know - - I don't think I would have granted it based on what I had in front of me. In fact, I know I wouldn't have granted it because some of these identifications were blood relative identifications and there was nothing that was ever presented to me that indicated that the police suggested or unduly suggested . . . .

Hamilton II, (ECF No. 10-11 at 34-35.)

Ineffective assistance of counsel may deprive a defendant of his constitutional right to counsel under the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 688 (1984). Under the first prong of the Strickland test, a petitioner must establish his counsel's representation fell below an objective standard of reasonableness. Id. "Judicial scrutiny of counsel's performance must be highly deferential." Id. at 689. "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).

To prove prejudice, as required under the second prong of Strickland, a petitioner must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

To determine whether counsel was ineffective in failing to request a Wade hearing or strike the identifications after Blagrove and Dickerson testified, the Court must consider the circumstances under which a Wade hearing is required. A Wade hearing is held to determine the admissibility of identification

13

testimony. <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114 (1977); <u>See</u> <u>United States v. Wade</u>, 388 U.S. 218, 219-20 (1967) (vacating conviction pending a hearing to determine whether the in-court identifications had an independent source). A <u>Wade</u> hearing is necessary when the out-of-court identification procedure "was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law . . . . [o]n the totality of the circumstances." <u>Neil v.</u> <u>Biggers</u>, 409 U.S. 188, 196 (1972) (citation and internal quotation marks omitted).

In a pretrial hearing on Petitioner's request for a <u>Wade</u> hearing, Petitioner's counsel admitted he did not have evidence that the identification procedures were unduly suggestive, he was relying on the fact that after Blagrove and Dickerson identified Petitioner in photo arrays, they provided written recantations stating Petitioner was not at the scene of the crime. (Trial Transcript, 10-2 at 8-10.) The written recantations said nothing about undue suggestiveness by the police in the identification procedures. (<u>Id.</u>)

The PCR Court, who was also the trial judge, stated he would not have granted a <u>Wade</u> hearing if it had been requested. Petitioner cannot show prejudice from counsel's failure to request a <u>Wade</u> hearing during trial or to strike Blagrove's and Dickerson's identifications because the trial court would not

14

have granted the motions. Thus, the Court will deny Ground Two of the Amended Petition because the state court correctly applied the Strickland test in denying Petitioner's ineffective assistance of counsel claim.

### 3.   Ground Three

In Ground Three, Petitioner contends he was denied his Sixth Amendment right to confront witnesses based on testimony by Tuten and Blagrove. (Am. Pet., ECF No. 3 at 34.) Tuten testified that he learned the name of the person who was believed to be his assailant from asking people in the neighborhood. (Id.) Blagrove testified that the police already knew Petitioner was involved in the crime at the time he was presented with a photo array for identification. (Id. at 35.)

Respondent asserts that Tuten's testimony was not offered for the truth of the matter asserted but instead to explain the sequence of events leading to codefendant Andrew Dennis becoming a suspect. (ECF No. 10 at 33.) Tuten testified:

> [PROSECUTOR]: Okay. Now prior to [when you were released from the hospital] you had not identified by name or photograph anybody for the police, is that correct?
>
> [TUTEN]: No, sir.
>
> [PROSECUTOR]: Now after you got out were you able to ascertain from talking to people in the neighborhood the name of the person who might have been involved?
>
> [TUTEN]: Yes, sir.

15

[PROSECUTOR]: Do you want to tell the jury about that?

[DEFENSE COUNSEL/DENNIS]: Objection. He's asking for hearsay.

[THE COURT]: Prosecutor?

[PROSECUTOR]: Judge, it's not to offer it to prove the truth of the matter asserted but only to explain the train of events that led to, I guess charges being filed in the end. I could ask it a different way.

[DEFENSE COUNSEL/DENNIS]: Your Honor, I think it at its root being asked for the truth of the matter.

[THE COURT]: Well, it, it certainly does appear to go to that issue. If you want to ask it another way and see if it's . . . .

[PROSECUTOR]: Certainly, Your Honor.

[THE COURT]: . . . admissible that way, I'll sustain the objection at this point in time.

[PROSECUTOR]: Did you, you spoke to people in the neighborhood, that would be fair to say?

[TUTEN]: Yes, sir.

[PROSECUTOR]: And after speaking to people in the neighborhood did you have occasion to tell Detective Riegel of a person who might be involved?

[DEFENSE COUNSEL/DENNIS]: Objection, it is still grounded in hearsay.

[PROSECUTOR]: Judge, it's not offered for the truth of the matter asserted. It's only asserted to explain why he did what he did, and he did do what he did.

16

> [THE COURT]: Yeah, that does take it out of
> Rule 803 under that context. There's a
> subtle difference now between this question
> and the earlier question. The earlier
> question was more open-ended. As to whether
> or not it's accurate that obviously will be
> subject to the jury's determination. But for
> the purpose that you are seeking to
> introduce it at this point I'll permit it.
> The objection is overruled for that reason.
>
> [PROSECUTOR]: And do you recall what the
> name was that you said to Detective Riegel?
>
> [TUTEN]: Um, I was given the nickname Sadiq.

[Trial Transcript, ECF No. 10-3 at 105-07.)

Respondent argues the Appellate Division correctly
reasoned:

> [w]e conclude that no right-to-confrontation
> violation occurred . . . the [trial] court
> sustain[ed] Dennis' objection, and the State
> rephrased its question in order not to
> elicit hearsay testimony. No further
> objection was made. More importantly, Tuten,
> the witness who had provided Detective
> Riegel with the information was a testifying
> witness available for confrontation.

Hamilton I, (ECF No. 10-14 at 40-41.)

Respondent further argues that Tuten's testimony regarding
"Sadiq" could not have prejudiced Petitioner because Detective
Riegel later made clear that "Sadiq" was in fact the street name
of codefendant Andrew Dennis, not Petitioner. (Answer, ECF No.
10 at 35, citing the trial transcript, ECF No. 10-7 at 42.)

17

The Confrontation Clause of the Sixth Amendment provides that "the accused shall enjoy the right . . . to be confronted with the witnesses against him" in all criminal prosecutions. Crawford v. Washington, 541 U.S. 36, 42 (2004). The text of the Confrontation Clause is focused on "witnesses" against the accused who "bear testimony." Id. at 51. "Testimonial" statements include "pretrial statements that declarants would reasonably expect to be used prosecutorially;" extrajudicial statements such as affidavits, depositions, prior testimony or confessions; and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Id. at 51-52 (internal citations omitted). Where testimonial evidence is at issue, the Confrontation Clause requires unavailability of the declarant and a prior opportunity for cross-examination before the evidence will be permitted. Id. at 68.

Here, Tuten testified that after leaving the hospital, he learned through talking to people in the neighborhood that "Sadiq" was involved in the crime. Because they were speaking informally with the victim, it is very unlikely that the persons who relayed this information to Tuten expected their statements would be available for use at a later trial. Therefore, the state court's determination that Tuten's testimony did not

18

violate the Confrontation Clause was not an unreasonable application of <u>Crawford</u>.

Petitioner further contends Blagrove's testimony that the police already knew Petitioner was involved in the crime before Blagrove was shown the photo array violated Petitioner's constitutional right to confrontation. (Am. Pet., ECF No. 3 at 35.) Respondent points out that this testimony was elicited by defense counsel to support a theory that the police had influenced Blagrove and Dickerson to falsely identify Petitioner during presentation of the photo array. (Answer, ECF No. 10 at 35.)

The trial record shows:

> [DEFENSE COUNSEL/PETITIONER]: Now what happened with these pictures? Were you shown pictures? What happened?
>
> [BLAGROVE]: I was shown pictures but they were mixed up. There was a thing they already knew who said what before I had a chance to say anything.
>
> [DEFENSE COUNSEL/PETITIONER]: What do you mean by that, who said that?
>
> [BLAGROVE]: Because when they went, when they had my brother [Dickerson] on tape he told them things but I don't know about them until I was told by Jeff Fauntleroy, actually it was hearsay.
>
> [DEFENSE COUNSEL/PETITIONER]: Is Jeff Fauntleroy a police officer?

19

[BLAGROVE]: Yes, he was. He told my aunt
what was said. And the names of the people
were mentioned already on there. So I didn't
know, you know what I mean, who did what.

[DEFENSE COUNSEL/PETITIONER]: Well, wait a
minute. Let me . . .

[BLAGROVE]: Well, I mean . . .

[DEFENSE COUNSEL/PETITIONER]: Wait. Hold on,
hold on. Was my client's name on that
picture, Abdus Samad?

[BLAGROVE]: Yes, it was. They already knew
that he was involved but it wasn't by me. It
wasn't by me until that, until he did that.
But they already had his name when they
first did the whole thing, the 14th.

(Trial Transcript, ECF No. 10-4 at 162-63.)

Relying on state law,[1] the Appellate Division held that
"where the errors are induced or invited by the defense, they
will not serve as a basis for reversal on appeal." (ECF No. 10-
14 at 40.) The court noted that one of the defense theories was
that Tuten orchestrated the police investigation and influenced
Blagrove and Dickerson to falsely identify the defendants. (Id.
at 41.) Petitioner's counsel did not object to the testimony
because it supported the defense theory. (Id.)

Habeas courts will not review questions of federal law that
were decided by a state court on a state law ground "that is
independent of the federal question and adequate to support the

---

[1] State v. Douglas, 204 N.J. Super. 265, 274 (N.J. Super. Ct.
App. Div. 1985).

judgment." <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991) (citations omitted). "[F]ederal habeas courts must ascertain for themselves if the Petitioner is in custody pursuant to a state court judgment that rests on independent and adequate state grounds." <u>Id.</u> at 736. "This rule applies whether the state law ground is substantive or procedural." <u>Id.</u> at 729 (citations omitted). If a federal habeas court releases a prisoner held pursuant to a state court judgment that rests on an independent and adequate state law ground, the habeas court ignores the State's legitimate reasons for holding the prisoner. <u>Id.</u> at 730. "To qualify as an 'adequate' procedural ground a state rule must be 'firmly established and regularly followed.'" <u>Walker v. Martin</u>, 562 U.S. 307, 316 (2011) (quoting <u>Beard v. Kindler</u>, 558 U.S. 53 (2009) (internal quotations omitted)).

Here, the Appellate Division relied on the invited-error doctrine to deny Petitioner's confrontation claim because the testimony complained of was elicited by the defense on cross-examination. The invited-error doctrine is an independent basis for denial of the federal claim.

In New Jersey, the invited-error doctrine is firmly established and regularly followed, although it is not automatically invoked if the doctrine were to cause a fundamental miscarriage of justice. <u>State v. A.R.</u>, 213 N.J. 542, 561 (2013) (under "settled principle of law," trial errors

induced by defense counsel are not ordinarily a basis for reversal on appeal); <u>New Jersey Div. of Youth and Family Services v. M.C. III</u>, 201 N.J. 328 (2010); <u>State v. Williams</u>, 219 N.J. 89, 100 (2014) (the doctrine is intended to prevent a defendant, who led a court into error while pursuing a tactical advantage that does not work as planned, from manipulating the system). Indeed, federal courts also apply the invited-error doctrine. <u>See</u> <u>e.g.</u> <u>U.S. v. Maury</u>, 695 F.3d 227, 256 (3d Cir. 2012) ("[u]nder the invited error doctrine, a defendant cannot complain on appeal of alleged errors invited or induced by himself") (internal citations omitted.))

Blagrove testified that Detective Jeff Fauntleroy told his aunt that the police knew Petitioner was involved in the crime. This statement was elicited by Petitioner's counsel, thereby implicating the invited-error doctrine. Regardless, even if the state court had applied <u>Crawford</u> to address the confrontation claim, Fauntleroy's statement was not testimonial because he would not have reasonably believed his conversation with Blagrove's aunt would be used at trial. His statement was clearly made for the purpose of investigation. Therefore, the Court will deny this claim as barred by the state court's independent and adequate state law ground, but the Court further notes that the challenged statement was not testimonial under <u>Crawford</u>.

22

Finally, Petitioner asserts he was denied his right to confrontation with respect to testimony about an unidentified female who told police that a man in a yellow fleece jacket, who was near the crime scene immediately after the crime, was not involved in the crime. (Am. Pet., ECF No. 3 at 35.)

The Appellate Division addressed this claim:

> [A]ccording to Detective Johnson, Tuten also stated that this same man was not one of the perpetrators when he was presented with him at the scene. The prosecution did not specifically elicit information regarding the female witness, which was explored in more detail by defense counsel.
>
> Even if the testimony concerning the female's statements was deemed inadmissible hearsay, it only related to exclusion of another suspect and did not constitute evidence of identification against the defendants. There was sufficient evidence in the record to support the convictions.

Hamilton I, (ECF No. 10-14 at 41-42.)

It appears that the Appellate Division relied on the invited-error doctrine in denying this claim. The Appellate Division stated the prosecution did not specifically elicit information about the female witness. The information was elicited by defense counsel. Therefore, the state court relied on an independent and adequate state ground for denying this claim.

The Court will deny Ground Three of the petition based on an independent and adequate state ground for denying the claim.

23

4.   Ground Four

In   Ground   Four,   Petitioner   claims   his   right   to
confrontation was denied during his counsel's opening statement
because he was prevented from offering the written statements of
Blagrove and Dickerson, recanting their prior statements to the
police. (Am. Pet., ECF No. 3 at 36, ¶7.)

Respondent   asserts   this   claim   is   unexhausted   and   without
merit because Petitioner was not denied confrontation.   (Answer,
ECF   No.   10   at   27.)   Defense   counsel   was   permitted   to   cross-
examine   both   Blagrove   and   Dickerson.   (Id.)   Respondent   also
contests   Petitioner's   claim   that   the   jury   was   deprived   of
Dickerson's written statement recanting his statement to police.
(Id. at 38.) Dickerson's written statement [State's Exhibit 90]
was   not   only   read   to   the   jury   by   the   prosecutor   during
Dickerson's   direct   examination,   it   was   entered   into   evidence.
(Trial Transcript, ECF No. 10-3 at 215-17; ECF No. 10-8 at 143.)

This   Court   reviewed   Petitioner's   opening   statement.   Defense
counsel   argued   the   witnesses   would   recant   the   identifications
they had made to police. (Trial Transcript, ECF No. 10-2 at 78-
79.) The prosecution objected because the witnesses had not yet
testified; therefore, it was not certain they would recant. (Id.
at 79-82.) The judge ruled in Petitioner's favor and allowed his
counsel   to   argue   that   Blagrove   and   Dickerson   recanted   their
statements.   (Id.   at   83.)   Furthermore,   as   Respondent   noted,

Dickerson's written recantation was read to the jury and submitted into evidence. Therefore, the record shows Petitioner's claim is factually incorrect. The Court will deny Ground Four of the Amended Petition.

      5. <u>Ground Five</u>

In Ground Five, Petitioner asserts that prosecutorial misconduct deprived him of a fair trial. (Am. Pet., ECF No. 3 at 37-38.) First, he alleged it was misconduct for the prosecutor to refer to a "home invasion robbery." (<u>Id.</u> at 37.) Respondent asserts there was no misconduct because the trial was about a home invasion robbery. (Answer, ECF No. 10 at 39.)

The Appellate Division noted that burglary, by definition, involved breaking and entering into a dwelling. <u>Hamilton I</u>, (ECF No. 10-14 at 43.) Therefore, use of the phrase "home invasion" was not inflammatory. (ECF No. 10-14 at 43.)

This Court must look at the context of the entire trial in assessing a claim of prosecutorial misconduct. Here, the prosecution alleged that armed perpetrators pushed their way into an apartment with the intention of robbing a drug dealer. It was not misconduct to refer to this incident as a home invasion. Therefore, the state court decision did not involve an unreasonable determination of the facts or an unreasonable application of clearly established federal law, and this claim will be denied.

Petitioner also contends that the prosecutor elicited testimony that impermissibly commented upon his exercise of the right against self-incrimination. (Am. Pet., ECF No. 3 at 37.) Petitioner asserts "the prosecutor specifically questioned Detective [Riegel] during his testimony about petitioner not returning his call, and refusing to answer any questions posed by the prosecutor's investigators at the time of petitioner's arrest." (Id.)

Respondent asserts that it was made clear on direct examination that before the post arrest interview, Petitioner was advised of his Miranda rights, and he agreed to answer questions. (Answer, ECF No. 10 at 39-40 citing the trial transcript ECF No. 10-8 at 102-07.) It was further elicited on cross-examination that Petitioner never refused to give a statement, either taped, written or oral. (Id. citing ECF No. 10-8 at 115-16.)

Respondent maintains the Appellate Division, on direct appeal, correctly determined that "[Petitioner's] objection to that testimony was overruled because the State was attempting to elicit an explanation as to why there was no taped statement and only an oral statement." Hamilton I, (ECF No. 10-14 at 43-44.) Moreover, the Appellate Division found that any negative inference suggesting Petitioner had invoked his right to remain

silent "was cured when Detective Riegel stated that [Petitioner] did not refuse to give a statement." (Id. at 44.)

In Doyle v. Ohio, the Supreme Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." 426 U.S. 610, 619 (1976). In that case, the Court noted that there was no claim of harmless error presented. Id. at 620. The constitutional harmless-error standard is "whether the [Government] has proved 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Virgin Islands v. Martinez, 620 F.3d 321, 337-38 (3d Cir. 2010) (quoting Chapman v. State of California, 386 U.S. 18, 24 (1967). Harmless error analysis must take into account the totality of the circumstances. Id. at 337.

Reviewing the pertinent testimony, Detective Riegel described how he read the Miranda rights form to Petitioner. (Trial Transcript, ECF No. 10-2 at 102-08.) Riegel testified to Petitioner's verbal responses to the questions on the form. For instance, "[d]o you desire to waive these rights and answer questions," to which Petitioner responded "yes." Then Petitioner proceeded to answer questions about where he was at the time of the crime. (Id. at 102-08.)

27

After Riegel's testimony that Petitioner asked to return to his cell, the prosecutor asked Riegel whether they were able to get a taped or written statement from Petitioner, and he said no. (Id. at 110-11.) On cross-examination, Riegel agreed that he took a statement from Petitioner but it was verbal, not written or taped. (Id. at 112.) On redirect, the prosecutor asked whether Petitioner volunteered to give a taped statement, and Riegel said no. (Id. at 114.) On recross, Detective Riegel agreed that his report did not reflect that Petitioner had refused to give a taped statement. (Id. at 115-16.) However, on the subsequent redirect, Riegel testified that he asked Petitioner to give a taped or written statement, and he refused. (Id. at 116.) On the following recross, Riegel admitted that his report did not mention anything about asking Petitioner to give a taped or written statement and Petitioner declining. (Id. at 115-16.)

In context of the complete testimony, there is little chance the jury made any negative inferences from Petitioner's request to return to his cell during the post arrest interview because he had already waived his Miranda rights and answered questions about where he was at the time of the crime. Petitioner did not invoke his right to remain silent.

Although Riegel testified that Petitioner declined to put his statement on tape or in writing, Petitioner's counsel

28

impeached this testimony by getting Riegel to admit that he had not made any notes reflecting the fact that he asked Petitioner for a taped or written statement. If there was any error in allowing Riegel's testimony that Petitioner declined to put his statement on tape or in writing, the error was harmless. The jury would not have inferred Petitioner invoked his right to remain silent because he answered Riegel's questions verbally. Therefore, the Court will deny this claim because the Appellate Division's decision was not contrary to or based on unreasonable application of the harmless error doctrine.

Petitioner next avers that it was misconduct for the prosecutor, in his summation, to comment on the fact that petitioner's grandmother's alibi statement was prepared the day before trial. (Am. Pet., ECF No. 3 at 37.) Respondent asserts the statement is true; therefore it was not misconduct. (Answer, ECF No. 10 at 41.)

In summation, the prosecutor argued:

> But his grandmother also told the police when they came to execute a search warrant that Abdus didn't live there anymore. And when I asked her about that on cross-examination she said, oh, she didn't know her grandson as Abdus, she knew him as Samad . . . And in the grandmother's alibi statement, and I don't mean to insult anybody but in the grandmother's alibi statement, which was prepared the day we started the trial, she says, 'my grandson, Abdus Samad Hamilton,' so I submit to you . . . that just like she was trying to protect

> her grandson when the police came with a
> search warrant on September 7th, 2000, when
> she came here today to testify to you she
> would say anything to protect her grandson .
> . ."

(Trial Transcript, ECF No. 10-8 at 219-20.)

"The prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence." U.S. v. Werme, 939 F.2d 108, 117 (3d Cir. 1991) (citing United States v. Scarfo, 685 F.2d 842, 849 (3d Cir. 1982)). Gireen Williams, Petitioner's grandmother, testified that she prepared her written alibi statement on May 21, 2001, which was the day before trial began. (Trial Transcript, ECF No. 10-8 at 35, ECF No. 10-1 at 1.) The prosecutor is entitled to invite the jury to draw any reasonable inference from that fact, including that the alibi was false because she did not come forward sooner.

Petitioner next claims that it was misconduct for the prosecutor to play the tape of Blagrove's August 31, 2000 statement to the police because Detective Riegel made reference to photographs from "another case." (Am. Pet., ECF No. 3 at 38.)

The following colloquy from the taped statement was played before the jury:

> [DET. RIEGEL]: Okay. Okay. The next is a group of
> photos from a case I was involved with. In the photos
> is the victim along with some suspects that came up.
> As previously stated, I want to go through each photo.

30

Victim number one, photo one is of the actual victim of the case. Do you know this male?

[BLAGROVE]: No.

[DET. RIEGEL]: All right. Photo - -

[DET. ROTH]: This is not the case that we're investigating. This is a previous case.

[DET. RIEGEL]: Yes.

[DET. ROTH]: Just so it's clear on tape.

[DET. RIEGEL]: Okay.

. . . .

[DET. RIEGEL]: This next photo is number 6. Do you know this male?

[BLAGROVE]: Yes.

[DET. RIEGEL]: Okay.

[DET. ROTH]: How do you know this male?

[BLAGROVE]: That's the actual shooter.

. . . .

[DET. ROTH]: This is the male that disguised himself?

[BLAGROVE]: With the black bandana, yes.

. . . .

[DET. RIEGEL]: I just want to add for the record at this time he's identified as Abdus Samad Hamilton . . . .

(Trial Transcript, ECF No. 10-6 at 51-54.)

31

The taped statement was played again during Riegel's direct testimony, and the defense objected. (Trial Transcript, ECF No. 10-7 at 65-67.) After a sidebar, the trial court instructed the jury, in relevant part:

> Ladies and gentlemen, there has been reference made to the use of photos that are in the hands of the government or the police. I'm going to give you this charge later as part of the overall charge, but I want to bring it up now so that you're aware of the fact, because there was some reference made that the police used some of these same photos as part of some other investigation, but I can indicate to you that that investigation in no way should be taken into account when assessing guilt or innocence of these defendants or any of the defendants allegedly involved in this case . . . .

(Id. at 68.) The instruction was repeated during the final jury charge. (Trial Transcript, ECF No. 10-9 at 13-14.)

The Appellate Division, on direct appeal, held "[b]ecause no definite reference to a criminal record was made, we conclude that the curative instruction given by the trial judge adequately addressed any negative implications." Hamilton I, (ECF No. 10-14 at 48.)

There is a presumption that a jury will heed an instruction "unless there is 'an overwhelming probability' that the jury will be unable to follow the court's instructions, and a strong likelihood that the effect of the evidence would be

'devastating' to defendant." <u>Greer v. Miller</u>, 483 U.S. 756, 767 n.8 (1987)(citation omitted).

In this instance, the state court reasonably applied Supreme Court precedent in finding the jury instruction adequately addressed Petitioner's concern. The jury was instructed not to draw the conclusion that Petitioner was involved in another criminal matter, and given the vagueness of the reference to another case, it is reasonable to believe the jury would follow this instruction. Therefore, the Appellate Division reasonably applied clearly established federal law in concluding that the prosecutor's conduct did not so infect the entire trial with unfairness as to violate Petitioner's right to due process. The Court will deny Ground Five of the Amended Petition.

        6.  <u>Ground Six</u>

In Ground Six, Petitioner contends his counsel was ineffective by failing to move for a severance of trial. (Am. Pet., ECF No. 3 at 74). Respondent argues that the PCR court correctly held: "[t]here was no argument as to severance or entitlement to severance . . . . There were no Brut[on] issues here. There were no statements made against a Co-Defendant." <u>Hamilton II</u>, (ECF No. 10-11 at 84.) The PCR Court also stated, "[d]espite the advantages of joint trials, Defendants rights are to be considered, but there was no circumstance here where any

33

of these individuals . . . were willing to A, accept guilt and
B, testify on behalf of each other . . . " Hamilton II, (ECF No.
10-11 at 44.) The Appellate Division "affirm[ed] substantially
for the reasons articulated by Judge Isman in his comprehensive
opinion." Hamilton III, (ECF No. 10-23 at 11.)

> Joint trials generally serve the interests
> of justice by avoiding inconsistent verdicts
> and enabling more accurate assessment of
> relative culpability—advantages which
> sometimes operate to the defendant's
> benefit. Even apart from these tactical
> considerations, joint trials generally serve
> the interests of justice by avoiding the
> scandal and inequity of inconsistent
> verdicts.

Richardson v. Marsh, 481 U.S. 200, 210 (1987). However, in
Bruton v. United States, 391 U.S. 123, 135-36 (1968), the
introduction of a nontestifying co-defendant's confession, which
inculpated the defendant in a joint trial, "posed a substantial
threat to petitioner's right to confront the witnesses against
him." Id. at 137.

Here, there was no basis for Petitioner's counsel to
request a severance. If he had done so, the trial court would
have denied the motion. Therefore, the state court reasonably
applied the prejudice prong of the Strickland standard in
denying Petitioner's ineffective assistance of counsel claim,
and this Court will deny Ground Six of the Amended Petition.

7.   Ground Seven

34

In Ground Seven of the Amended Petition, Petitioner claims he received ineffective assistance of trial counsel because counsel failed to request a competency hearing regarding Witness Lonell Blagrove. (Am. Pet., ECF No. 3 at 38.) Blagrove testified that he took pain medication before coming to court. (Id. citing the trial transcript, ECF No. 10-4 at 76-80.) The prosecutor recommended a competency hearing, but the trial court found it was unnecessary because Blagrove appeared competent to testify. (Id., ECF No. 10-4 at 80-84.)

The PCR Court did not specifically address the failure of defense counsel to request a competency hearing based on Blagrove's testimony that he took pain medicine before giving testimony. Therefore, the Court will review the trial court's decision not to hold a competency hearing. See Harrington v. Richter, 562 U.S. 86, 98 (2011) ("determining whether a state court's decision resulted from an unreasonable legal or factual conclusion does not require that there be an opinion from the state court explaining the state court's reasoning.") "[A] habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at 102.

Under New Jersey law, witnesses are presumed competent to testify. State v. Kirvacska, 341 N.J. Super. 1, 33-36 (N.J. Super. Ct. App. Div.) certif. denied, 170 N.J. 206 (2001). The decision of a nondefendant witness's competency is left to the sound discretion of the trial court. State v. Scherzer, 301 N.J. Super. 363, 463 (App. Div.) certif. denied, 151 N.J. 466 (1997)). Under New Jersey Rule 601, general rule of competency:

> Every person is competent to be a witness unless (a) the judge finds that the proposed witness is incapable of expression concerning the matter so as to be understood by the judge and jury either directly or through interpretation, or (b) the proposed witness is incapable of understanding the duty of a witness to tell the truth, or (c) except as otherwise provided by these rules or by law.

The trial court carefully considered the prosecutor's request for a competency hearing regarding Blagrove. (Trial Transcript, ECF No. 10-4 at 75-85.) There is nothing in Blagrove's testimony that would lead the judge to conclude Blagrove was incapable of "expression concerning the matter as to be understood by the judge and jury" or that he was incapable of understanding the duty to tell the truth. Blagrove claimed not to remember certain things because he was on medication, but he was able to express himself and understand the duty to tell the truth. (Id. at 85-106.)

36

The record supports the trial court's denial of the prosecutor's request for a competency hearing. Therefore, it is possible fairminded jurists could disagree that Petitioner's counsel was not ineffective for failing to argue for a competency hearing. The Court will deny Ground Seven of the Amended Petition because Petitioner has not met the standard for habeas relief.

8. <u>Ground Eight</u>

In his eighth ground for relief, Petitioner contends he received ineffective assistance of counsel because counsel failed to challenge the verdict as being against the weight of the evidence. (Am. Pet., ECF No. 3 at 39.) Petitioner did not support his claim, he relied on his Amended PCR Petition and Brief dated September 11, 2008 ("Am. PCR Brief") (<u>Id.</u>) Respondent correctly notes that trial counsel made a motion for a new trial, arguing the verdict was against the weight of the evidence. (Answer, ECF No. 10 at 49.) In his Amended PCR brief, however, Petitioner blamed his *appellate counsel* for presenting the weight of the evidence issue in a cursory form, and "failing to address several meritorious issues." (Am. PCR Brief, ECF No. 10-17 at 75.)

Petitioner alleged "[a]ppellate counsel did not specifically refer to the record which clearly illustrates that the Motion Court was unable to dissociate my defense from that

of the other two defendants." (Id.) He also asserted appellate
counsel "failed to bring forward constitutional error regarding
the failure to conduct identification hearings" and "failed to
argue incorrect jury charges." (Id.)

First, as to Petitioner's contention that the court was
unable to dissociate his defense from the other two defendants,
which presumably was a claim that the joint trial prejudiced
Petitioner, the PCR Court stated:

> But these gentlemen all were clearly aware
> of what their exposure was in the many
> conferences that I held . . . But you can't
> have it both ways and if Dennis and Palmer
> were never going to admit to being guilty
> and take this gentleman out . . . then he
> has no argument . . . because that's the
> only exception . . . where he can't get a
> fair trial because he can't call Dennis or
> Palmer to the witness stand because they are
> on trial with him . . . the clear indication
> was . . . [n]one of the defendants felt
> Tuten was going to come to court. None of
> the defendants felt Blagrove and Dickerson
> were going to come to court. And the
> Defendants felt that if they came to court,
> they certainly were never going to testify .
> . . against the Defendants.

Hamilton II, (ECF No. 10-11 at 44-45.)

Second, the PCR Court found appellate counsel was not
ineffective by failing to assert error of trial counsel for not
requesting a Wade hearing. (Id. at 36.) The PCR Court stated:

> A Wade hearing is not required. A mere
> demand or request by a Defendant does not
> mandate that a Wade hearing be conducted and

> I would venture to say that had
> [Petitioner's trial counsel] pursued and
> demanded a Wade hearing, that none would
> have been granted to him because there was
> no evidence or - - of impermissible
> suggestiveness.

(<u>Id.</u>)

Third, with respect to the jury charges, the PCR Court noted the Appellate Division "found no error at all" in the lengthy and complex jury charge that was given. (<u>Id.</u> at 43.) Finally, the PCR Court explained why the verdict was not against the weight of the evidence, and noted that the Appellate Division had agreed. (<u>Id.</u> at 45.) The PCR Court found the verdict was supported by the witnesses' ineffective attempts to recant prior identifications of the defendants and by the poor alibi witnesses. (<u>Id.</u>)

"[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." <u>Smith v. Robbins</u>, 528 U.S. 259, 288 (2000) (quoting <u>Jones v. Barnes</u>, 463 U.S. 745 (1983)).

The PCR Court properly applied the <u>Strickland</u> standard in determining that it "does not constitute ineffective assistance if a lawyer deems something to be unworthy or unmeritorious." <u>Hamilton II</u>, (ECF No 10-11 at 36.) Therefore, the Court will

deny the claim of ineffective assistance of appellate counsel in
Ground Eight of the Amended Petition.

> 9.   Ground Nine

Petitioner raises two claims of ineffective assistance of
counsel in Ground Nine of the Amended Petition. (Am. Pet., ECF
No. 3 at 40.) First, he contends his counsel erred in his
opening statement by stating, "[m]y client is going to maintain,
and he has the choice to take the stand, he may or may not,
we'll see, and then you'll hear it first-hand, he didn't do it
and he wasn't there." (Trial Transcript, ECF No. 10-2 at 83.)

Respondent argues this statement did not prejudice
Petitioner. (Answer, ECF No. 10 at 50.) Although Petitioner
ultimately did not take the stand, the defense presented two
alibi witnesses who testified that Petitioner was somewhere else
during the crime. (Id.) Additionally, Dickerson and Blagrove
recanted their statements that Petitioner was involved in the
crime. (Id.)

Addressing this claim, the PCR Court stated:

> Well, they did hear it firsthand, if you
> will, from the [petitioner's] alibi
> witnesses that he wasn't there. And
> arguably, they heard it firsthand from
> Dickerson and Blagrove when they recanted
> that Mr. Hamilton wasn't there. So there's
> absolutely nothing to the contrary [of
> counsel's statement in his opening].

Hamilton II, (ECF No. 10-11 at 38.) The court added that defense counsel appropriately emphasized his key defense, that Petitioner was not present and did not take part in the crime. (Id.)

Although it may have been preferable not to raise the issue of whether the defendant may or may not testify, there is little doubt this statement did not affect the outcome of trial. As the PCR Court noted, Petitioner's defense was that he had an alibi, and the defense put on two alibi witnesses. Additionally, the witnesses who had earlier identified Petitioner recanted. The PCR Court stated it was the lack of credibility of these witnesses that likely produced the outcome of the trial. Therefore, the PCR Court's denial of Petitioner's ineffective assistance of counsel claim was not contrary to or based on an unreasonable application of the prejudice prong of Strickland.

Petitioner's second claim under Ground Nine is that his counsel's ineffectiveness resulted in him not testifying in his own defense. (Am. Pet., ECF No. 3 at 40.)

The PCR court stated:

> This colloquy that I had with the Defendant completely and absolutely refutes his argument with respect to whatever his attorney did or didn't do . . . I had a colloquy with you. I informed you you had an absolute right to testify, that if you had a prior indictable it could come up during Cross-examination but only to effect (sic) your credibility. When asked if you

41

understood this you said unequivocally, yes. That's the Trial Transcript 6, Volume 1, page 39, lines 25 to Page 40, Lines 5.7

When asked if you were forced or threatened by anyone to not testify, you said you were not. You told me that you understood your Fifth Amendment right not to testify and this was what you freely elected to do. Page 40, Lines 10 to 15. I asked if you had spoke[n] to your attorney about testifying. You told me under oath you did. I then asked you, and you're satisfied with the advised (sic) he's given you through out these proceedings particularly with regard to testifying or not testifying. You responded yes.

Apparently you didn't read this transcript carefully enough before you advanced that argument. That argument fails.

Hamilton II, (ECF No. 10-11 at 37-38.)

The PCR Court provided persuasive reasons for rejecting this ineffective assistance claim as baseless. Therefore, Petitioner has not established that the PCR Court's decision was contrary to or involved unreasonable application of the Strickland test. The Court will deny Ground Nine of the Amended Petition.

> 10. Ground Ten

In Ground Ten of the Amended Petition, Petitioner claims that his counsel was ineffective by failing "to investigate and protect petitioner's alibi defense." (Am. Pet., ECF No. 3 at 40.) Petitioner relied on his Amended PCR Petition and Brief

dated September 11, 2008, in support of this claim. (Id.) In that brief, Petitioner contends his trial counsel "waited to the eleventh hour" to present his alibi defense, which subjected Petitioner to a jury charge that the jury could consider the alibi as a "recent fabrication." (Am. PCR Brief, ECF No. 10-17 at 59.)

The PCR Court addressed this issue as follows:

> The fact is that regardless of what the Defendant did or didn't do and regardless of what the investigators did or didn't do, the jury charge did not penalize the defendant. I advised the jury, as I'm supposed to advise them, that they may consider the time in which the alibi witness came forward and - - and you've admitted to me that there [sic] witnesses did not come forward on their own, did - - did not go to the police, did not go to the prosecutor, did not go to any attorney, did not go to Mr. Kozmor, did not go to the other two counsel at any time prior to the trial. But I also specified to the jury that that consideration should be used only for the limited purpose [of assessing] the credibility of that witness account.

Hamilton II, (ECF No. 10-11 at 32.) Alibi witness Jerine Harris, who was the mother of Petitioner's child, testified that she never went to the police to provide Petitioner's alibi. (Id.) Jyrine Williams, Petitioner's grandmother, testified that Petitioner babysat his child every day at her home, but testimony showed that when the police came to her home to execute a search warrant, she said Petitioner did not live

43

there. (Id. at 33.) There was no testimony that she ever went to the police to provide Petitioner's alibi. (Id.)

The PCR Court noted that the prosecutor had a "field day" cross-examining the alibi witnesses. Hamilton II, (ECF No. 10-11 at 32.) Harris, the mother of petitioner's child, never went to the police to offer the alibi that he was at home babysitting their child at the time of the crime. (Id.) The PCR Court aptly stated what the jury might have inferred, that "anyone with an ounce of common sense" who could have provided an alibi for their loved one who was sitting in jail would have gone to the police. (Id.)

Petitioner's grandmother's testimony was subject to attack because she was not with Petitioner at the time of the crime. (Id. at 33.) Furthermore, her testimony that he was at her home babysitting that day as usual was contradicted by the fact that she told detectives Petitioner did not live with her. (Id.)

The record supports the PCR Court's determination that the jury likely would have discredited the alibi witnesses even if they had not been instructed that they could consider the timing of when the witnesses came forward. Therefore, the PCR Court's denial of the claim was not contrary to or based on an unreasonable application of the Strickland test.

    11.  Ground Eleven

Finally, in Ground Eleven of the Amended Petition, Petitioner asserts that his counsel was ineffective by failing to take corrective action during the "Blagrove outburst." Petitioner cites the following trial testimony:

> [BLAGROVE]: Judge, before you play this [referring to Blagrove's statement to the police] . . . because I thought this is wrong as hell because I don't remember none of this stuff, you know that I mean.
>
> [THE COURT]: . . . The prosecutor will ask you about it. Just please sit there and listen with the rest of us.
>
> [BLAGROVE]: I'm not because this guy's going to try to get me killed up in here, you know. Why do you let this stuff play?
>
> [THE COURT]: Sir, no questions are being asked.
>
> [BLAGROVE]: No, he's trying to put me in a sling here, you know what I mean. . .

(Trial Transcript, ECF No. 10-4 at 155-56.)

When the prosecutor commented that Blagrove seemed agitated, Blagrove testified, "Damn right. I gotta live out in those streets and you don't. I gotta go out there and I gotta go to work everyday. And by playing the bull right then you probably got me marked for fuckin death. Excuse my terminology. I'm sorry." (Trial Transcript, 10-4 at 156-57.) The judge did not tell the jury to disregard the outburst.

Respondent contends Petitioner originally raised this claim on direct appeal, and thereafter "cloaked" the claim as

45

ineffective assistance of counsel on PCR. (Answer, ECF No. 10 at 52-53.)

On direct appeal, the Appellate Division found Petitioner had failed to demonstrate that the verbal substance of the outburst "was clearly capable of producing an unjust result." Hamilton I, (ECF No. 10-14 at 48-49.) After his outburst, Blagrove was provided an opportunity to explain why he did not want his taped statement to the police played to the jury. (Id.) He testified that "he had not been threatened by anyone" but his statement "had been made under duress" by police. (Id. at 49.) The Appellate Division concluded "this exploration into Blagrove's comments by both sides adequately supports the trial court's silence." (Id.)

The PCR Court stated:

> All of these issues with regard to Blagrove's outburst, it was denouncing Defendant as guilty, making it seem like Defendant would hurt him. This issue was reviewed by the Appellate Division. Defendant tries to argue that Appellate Counsel did not frame the outburst in the right context . . . there was nothing inappropriate with the way that was handled, with how it came out in front of the jury. Clearly, that is not what convicted the Defendant.

Hamilton II, (ECF No. 10-11 at 39.) The PCR Court opined that Defendant was convicted primarily based on Blagrove and Dickerson's "pathetic" attempts at recanting their prior

46

identifications of defendant, which were obviously lies that the jury saw through. (Id. at 29-30.)

In reviewing Blagrove and Dickerson's testimony in full (Trial Transcript, ECF No. 10-3 at 188-99; 10-4 at 46-55, 74-187), this Court finds the PCR Court reasonably concluded that the outcome of the trial was not prejudiced by Blagrove's outburst. The outcome of the trial was likely the consequence of Blagrove's and Dickerson's lack of credibility in recanting their otherwise credible identifications of Petitioner as the shooter. Their testimony was not credible because they both exhibited unusually selective memories of the events. They could not remember anything that implicated Petitioner, but they could remember many things about the day of the crime and the investigation other than the identity of the assailants. The jury did not need Blagrove's outburst to conclude Blagrove and Dickerson changed their minds about cooperating with the prosecution. Therefore, even assuming trial counsel erred in not requesting a mistrial or some other corrective action in response to Blagrove's outburst, Petitioner cannot meet the prejudice standard under Strickland, based on either trial or appellate counsel's performance. The Court will deny Ground Eleven because the PCR Court's decision was not contrary to or based on an unreasonable application of the prejudice prong of Strickland.

IV.   CERTIFICATE OF APPEALABILITY

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).

For the reasons discussed above, Petitioner has not made a substantial showing of the denial of a constitutional right. Therefore, the Court will deny a certificate of appealability.

V.   CONCLUSION

For the reasons discussed above, in the accompanying Order filed herewith, this Court will deny the Amended Petition for habeas relief under 28 U.S.C. § 2254.


Dated: December 21, 2016

                          s/Renée Marie Bumb
                          **RENÉE MARIE BUMB**
                          **United States District Judge**

48